**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 23-138** |
| | ) | |
| **LAVEN DAVIS** | ) | |

### Opinion and Order on Laven Davis's Motion to Suppress

Defendant Laven Davis is charged with one count of Distribution of Fentanyl Resulting in Serious Bodily Injury and Death, in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(C). ECF No. 1. Presently before the Court is Mr. Davis's Motion to Suppress Statements. ECF No. 35. The government filed a Response in opposition to the Motion, to which Mr. Davis has filed a Reply. ECF Nos. 38 & 39. A hearing on the motion was held on November 26, 2024. ECF No. 42. At the hearing, testimony was presented from Detective Anthony Settle of the Mercer County District Attorney's Office. Thereafter, the defense filed a Post-Hearing Brief, to which the government filed a Response. ECF Nos. 49 & 52. After consideration of the pleadings, exhibits, the testimony offered at the hearing, and the arguments of counsel, and for the reasons that follow, Mr. Davis's Motion to Suppress Statements will be denied.

### I.    Background

Mr. Davis argues that he was in custody when he was questioned in the back seat of a police car by two Mercer County Detectives, without having been given the required procedural safeguards pursuant to *Miranda v. Arizona*, 384 U.S. 438 (1966).

Mr. Davis is charged as follows:

> On or about November 28, 2022, in the Western District of Pennsylvania, defendant, LAVEN DAVIS, did knowingly, intentionally, and unlawfully distribute a quantity of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, and serious bodily injury and death

to B.G., a person known to the grand jury, resulted from the distribution and use of the mixture and substance.

       In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

Indictment, ECF No. 1.  The victim-decedent in this case, B.G., is alleged to have received from Mr. Davis a controlled substance containing fentanyl on November 28, 2022, and subsequently, on November 29, 2022,  she overdosed and died.  Tr. Supp. Hearing, Nov. 26, 2024, at 5; ECF No. 43.  A toxicology screen performed after her death revealed that B.G. had several substances in her system, including fentanyl, 4-ANPP, topiramate, gabapentin, naloxone, nordiazepam, and alprazolam.  *See* ECF No. 34, at 2.  Law enforcement had taken possession of her cell phone and a forensic extraction of the cell phone was performed.  Tr. 5.  The extraction showed that, on November 28, 2022, B.G. and Mr. Davis engaged in several conversations, followed by B.G. sending money to Mr. Davis.  Mercer County Detective Anthony Settle's review of all of the cell phone extraction information led him to believe that Mr. Davis was the person who sold B.G. the controlled substance that caused her death.  Tr. 5-6, 15.  He therefore decided to talk with Mr. Davis about B.G.'s death.

       Prior to December 20,2022, Detective Settle had previously interviewed Mr. Davis, as Mr. Davis was a victim in connection with alleged fraudulent activity of his former defense counsel.  Tr. 6.  That interview took place approximately nine to ten months prior to December, 2022.  Tr. 6-7.  Prior to meeting Mr. Davis on December 20, 2022, Detective Settle also was aware that Mr. Davis was under criminal parole supervision in Pennsylvania.  Gov. Ex. 1, Det. Settle's Supplemental Report – Incident Investigation – Interview (Laven Davis), Dec. 20, 2022, at 2.  Detective Settle knew parole supervision required Mr. Davis to adhere to certain conditions, that he must report to his parole officer as required, and generally, he must comply with the directions of his parole officer.  Tr. 11-12.  Detective Settle agreed with defense counsel

that it is possible that Mr. Davis's parole officer instructed him to remain at the residence until the Detectives arrived, however there was no evidence introduced to support that suggested proposition. Tr. 17.

With respect to the cell phone extraction, Detective Settle knew that B.G. and Mr. Davis had exchanged messages through Facebook Messenger relative to B.G. purchasing drugs from Mr. Davis. Tr. 15, 20, 21. Detective Settle further knew that B.G. and Mr. Davis discussed using Cash App or a Chime account to conduct a financial transaction to complete the drug deal. Tr. 21, 33-34.

Detective Settle spoke with Mr. Davis's parole officer prior to the interview. The parole officer gave Detective Settle the address where Mr. Davis was performing handyman work for his employer, Harris Home Improvement. Tr. 11, 12-13; Gov. Ex. 1 at 1. After learning where Mr. Davis was working, Detectives Settle and his partner, Mercer County Detective Tom Mack, drove to the address in an unmarked police car to talk to Mr. Davis. Tr. 11; Gov. his Ex. 1 at 1. Both Detectives wore khaki pants and dress shirts, they each had their police badge visible, and each carried a handgun. Tr. 24-25. Detective Settle testified that, upon approach to the residence, which was identified as a duplex, the Detectives saw a female "enter an open fence to the rear of the duplex." Gov. Ex. 1 at 1; Tr. 24. Detective Settle testified that, after going through the rear fence, there was "a small sidewalk that leads up to the back porch." Tr. 23. The Detectives approached the rear porch, noting that there were two apartment doors on the porch, and Detective Settle knocked on the door of Apartment 1. Gov. Ex. 1 at 1. Mr. Davis opened the door to the apartment and stepped out onto the porch. Gov. Ex. 1 at 1.

Detective Settle told Mr. Davis that they were there to talk to him, and because of the cold weather, they wanted to talk in a climate-controlled environment. Tr. 25; Gov. Ex. 1 at 1.

Mr. Davis put on his jacket and, as the group walked towards the police car, Detective Settle told

Mr. Davis that he was not under arrest and that he did not have any arrest warrants for him.  Gov.

Ex. 1 at 1.  Detective Settle then asked Mr. Davis if they could either go to the local police

station to talk or talk inside the Detective's unmarked police car.  Gov. Ex. 1 at 1.  Mr. Davis

declined the offer to go to the police station, because he was in the middle of a project and did

not want to leave.  Tr. 25; Gov. Ex. 1 at 1.  Detective Settle responded by offering that they

could talk in the police car, to which Mr. Davis agreed.  Tr. 25.

     Mr. Davis, on his own, "was starting to get into the back passenger side" of the car when

Detective Settle told him he preferred if he sat in the front passenger seat.  Tr. 25; Gov. Ex. 1, at

1-2.  Mr. Davis did not want to sit in the front seat, because he did not want to be seen in a police

car.  Tr. 25; Gov. Ex. 1 at 1-2.  Therefore, Mr. Davis sat in the back passenger seat, next to

Detective Mack.  Tr. 25.  Detective Settle sat in the front driver's seat.  Tr. 25.  Inside the car,

Detective Settle again informed Mr. Davis that he was not under arrest, that there were no arrest

warrants for him, and that he was free to leave at any time.  Tr. 27, 38-39; Gov. Ex. 1 at 2.  The

back doors of the police car could not be opened from the inside.  As a result, Detective Settle

informed Mr. Davis that, if he wanted to leave, all he had to do was ask and one of the

Detectives would open the door for him.  Tr. 26.

     Mr. Davis was not given *Miranda* warnings at any time prior to being questioned or

while he was being questioned.  Tr. 7, 27.  During the interview, Detective Settle told Mr. Davis

that B.G. had died from an overdose, and that he was investigating her death.  Tr. 29, 30.  Mr.

Davis was surprised and visibly upset; and, at one point, he put his face in his hands.  Tr. 30.

Detective Settle eventually showed Mr. Davis a copy of incriminating November 28, 2022

Facebook chats between Mr. Davis and B.G.  Tr. 31.  Detective Settle told Mr. Davis that, based

upon the chat messages, he believed that Mr. Davis sold B.G. the drugs that led to her death.  Tr. 31.  Mr. Davis told Detective Settle that he knew he was the one who had "set up the deal."  Tr. 34.  Mr. Davis made inculpatory statements, which are the subject of the present suppression motion.  After the interview, Detective Settle told Mr. Davis he was free to leave, and Mr. Davis did leave.  Tr. 36, 38.

## II.    Applicable Law

Mr. Davis seeks to suppress the statements he made during the encounter, as he argues they were statements obtained during a custodial interrogation in violation of the Fifth Amendment to the United States Constitution and his rights articulated in *Miranda v. Arizona*, 384 U.S. 438 (1966).  The Fifth Amendment to the United States Constitution provides that all criminal defendants have a privilege against self-incrimination.  U.S. Const. Amend. V.  Pursuant to *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogations of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. 384 U.S. 438, 444 (1966).  A custodial interrogation consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*  The "procedural safeguards" referred to by the Supreme Court are the requirement that law enforcement inform a person of the familiar *Miranda* rights. *Id.*

Generally, law enforcement officers are only required to *Mirandize* a person that is "in custody." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006).  "A person is in custody when he either is arrested formally or his freedom of movement is restricted to 'the degree associated with a formal arrest.'" *Id.* (quoting *United States v. Leese*, 176 F.3d 740, 743 (3d Cir.

1999)).  "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'"  *Willaman*, 437 F.3d at 359 (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)).  When determining if a person who has not been formally arrested is "in custody," a court is guided by consideration of the following non-exhaustive factors:

> (1) whether the officers told the suspect he was under arrest or free to leave. *Willaman*, 437 F.3d at 359.
> (2) the location or physical surroundings of the interrogation. *Id.*
> (3) the length of the interrogation.  *Id.*
> (4) whether the interviewee agreed to meet knowing that he would be questioned about a criminal offense.  *United States v. Ludwikowski*, 944 F.3d 123, 132 (3d Cir. 2019).
> (5) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement. *Willaman*, 437 F.3d at 359-60.
> (6) whether the suspect voluntarily submitted to questioning.  *Id.* at 360.
> (7) whether the questioner believed the interviewee was guilty, "but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would have perceived his or her freedom to leave."  *Stansbury v. California*, 511 U.S. 318, 325 (1994).
> (8) whether the interviewee was released when the questioning was over. *Ludwikowski*, 944 F.3d at 132.

*See also United States v. King*, 604 F.3d 125 (3d Cir. 2010).  These non-exhaustive factors are examined by a court to determine if the interviewee's freedom of movement was restricted to a degree associated with a formal arrest.  *Id*.  The Third Circuit describes the court's "freedom-of-movement" determination as "a necessary and not a sufficient condition for *Miranda* custody." *Id.* (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)).   If it is determined that the defendant's freedom of movement was restricted to a degree associated with a formal arrest, then the court must also ask "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."

*Ludwikowski*, 944 F.3d at 132 (quoting *Howes*, 565 U.S. at 509).  Finally, in determining whether a defendant was in custody, the court must focus only on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  *Stansbury*, 511 U.S. at 323.

### III.    Discussion

Considering the facts of this case, in light of the relevant factors, and considering the totality of the circumstances, the Court concludes that Mr. Davis was not in custody at any time during his encounter with the Detectives.  Therefore, there is no *Miranda* violation.

### (1) Whether the officers told the suspect he was under arrest or free to leave

Upon first encountering Mr. Davis, Detective Settle immediately told him that he was not under arrest, that there were no arrest warrants for him, and that he was free to leave at any time. Once the Detectives and Mr. Davis agreed that the interview would take place in the police car, Detective Settle again told Mr. Davis, as they walked toward the car, that he was not under arrest and that he was free to leave.  Once inside the car, Detective Settle again told Mr. Davis he was not under arrest and that he was free to leave.  He stated that all Mr. Davis had to do was ask and one of the Detectives would open the backseat door for him.  Finally, when the interview was over, the back door of the car was opened for Mr. Davis, and he was permitted to leave.  There is no evidence suggesting that either Detective told Mr. Davis that he might be arrested or that he was not free to leave.  All evidence clearly demonstrates that the Detectives told Mr. Davis that he was not under arrest and that he was free to go,  Accordingly, this factor weighs in favor of finding that Mr. Davis was not in custody.

### (2) The location or physical surroundings of the interrogation

No questioning occurred during the initial encounter at the rear of the residence where

Mr. Davis was working, and no questioning occurred as the Detectives and Mr. Davis walked from the rear of the residence to the police car. Nonetheless, to the extent it is relevant, the location and physical surroundings of the outside of the residence where Mr. Davis was working were unexceptional. The location was familiar to Mr. Davis; and, although any person might experience some degree of surprise and nervousness when approached by law enforcement while working, Mr. Davis was immediately told he was not under arrest, he was free to leave, and neither Detective attempted to question Mr. Davis. The Detectives also did not restrict Mr. Davis's movement at the residence or on the walk to the police car. Mr. Davis chose where the questioning was to occur. He was offered the police stations or the police car. Further, he even chose where he would sit in the car.

The actual questioning took place inside the police car. The police car had four doors, two front doors and two back doors. The rear doors of the police car were locked from the outside, so an occupant in the back seat would need someone else to open the back door in order to exit the car. The police car was parked on the road close to the location where Mr. Davis was working, and it was not moved from its parked location during the interview. Mr. Davis sat in the rear passenger seat, while Detective Mack sat next to Mr. Davis in the rear driver's side seat. Detective Settle sat in the front driver's seat.

Factored into consideration of the location of the interview in a police car, is the fact that, despite being offered the front seat, Mr. Davis chose to sit in the back seat. Although, by sitting in the back seat, Mr. Davis was not able to exit the car without someone opening the door from the outside, Detective Settle told Mr. Davis that all he had to was ask and one of them would open the rear door and let him exit. While the back seat of a police car is usually "a secured area to transport people who have already been arrested," such was not the case in Mr. Davis'

circumstance.  Def. Post-Hrg. Br. 6.  He was not under restriction at all, given the choice he made and the several assurances that he could leave at any time.

Inside the car, the Detectives reiterated to Mr. Davis that he was free to leave and that he was not under arrest.  At no time was Mr. Davis stopped from leaving the car, nor did he ask to exit the car.  In this case, the circumstances support the conclusion that the physical location of the interview was not inherently intimidating or coercive such that Mr. Davis lacked freedom of movement.

The totality of the circumstances, considering the location and physical surroundings of the police car where the questioning occurred; that Mr. Davis's freely chose to speak with the Detectives, to meet with them inside the police car, and to sit in the back seat of the police car; that he was told he was not under arrest and was free to leave; and that the interview was relatively short, thirty-seven minutes, supports this Court's finding that the interview in the police car was not coercive under the presenting circumstances.  This factor thus leans towards a finding that Mr. Davis was not n custody.

**(3) The length of the interrogation**

The length of questioning, according to Detective Settle's report of the interview, was thirty-seven minutes.  The minimal length of the interrogation also leans in favor of finding that Mr. Davis was not in custody.

**(4) Whether the interviewee agreed to meet, knowing that he would be questioned about a criminal offense**

Here, the evidence supports that Mr. Davis did not know that he would be questioned about a criminal offense before the beginning of the interview in the police car.  Prior to questioning Mr. Davis, the Detectives had not told him what they wanted to talk with him about.  In addition, Mr. Davis's surprised and upset reaction, upon hearing of B.G.'s death, suggests that

he did not know the Detectives wanted to talk to him about a criminal offense. Thus, this factor

favors Mr. Davis's position; however, this factor is not determinative under the totality of the

circumstances.

### (5) Whether the officers used coercive tactics, such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement

With respect to coercive tactics employed by the Detectives, this factor weighs in favor

of the government. The defense argues, however, that coercion is evident in the circumstances.

The defense suggests that Mr. Davis's parole officer ordered him to stay where he was, because

law enforcement was coming to talk to him. The defense argues that, if he did not obey his

parole officer, he may have suffered negative consequences, including the loss of his freedom.

Next, the defense points to the police car, with its locked rear passenger compartment, as being

inherently coercive, "because it is a secured area [for] transport[ing] people who have already

been arrested." Def, Post-Hrg. Br. 6. The defense points out that each Detective possessed a

firearm. Also, Mr. Davis had reason to view Detective Settle as non-threatening, based upon his

prior experience with Detective Settle , when Mr. Davis was a victim. In arguing that Mr. Davis

was unexpectedly confronted with the news that B.G. had died from an overdose and that

Detective Settle believed Mr. Davis to have been responsible, the defense posits that such

circumstances created a coercive confrontation for Mr. Davis.  .

The Court's review of the circumstances leads to a different conclusion. As noted, the

Detectives wore Khaki pants and dress shirts. Both Detectives had their police badge displayed

and each carried a weapon. However, neither Detective physically restrained Mr. Davis, used a

hostile tone of voice, drew a weapon, or referred to the use of any weapon. When Mr. Davis was

sitting in the backseat of the police car during questioning, Detective Settle and Detective Mack

were both seated on the driver's side of the car, with Detective Settle in the driver's seat. While

the rear passenger door could not be opened from the inside, the Detectives did not position themselves inside the car in a manner to indicate that Mr. Davis would not be free to leave if he wanted to.  Again, it is significant that Mr. Davis chose to talk with the Detectives, he chose the police car for the location of the discussion, and he chose to sit in the backseat.   These decisions were freely made after being told that he was not under arrest and was free to leave.  Such decisions are contrary to any showing of coercion by the Detectives.

The evidence also supports that Detective Settle's manner of questioning was not done in any intimidating or hostile manner.  In addition, the fact that Detective Settle presented incriminating chats to Mr. Davis and expressed his belief that Mr. Davis was responsible, is a natural path of inquiry in any investigation of this sort, particularly where law enforcement possesses persuasive evidence.  No one suggests that Detective Settle should not have used the evidence or made his accusation.  Here, the evidence shows that the Detectives did not use hostile tones of voice, did not display weapons, and did not physically restrain Mr. Davis.  There is also no evidence that the Detectives kept Mr. Davis inside the car longer than necessary in any effort to "wear him down."  Finally, Detective Settle's report of the thirty-seven-minute interview, as well as Detective Settle's testimony, support that there was no coercive conduct by the Detectives.  This factor favors the government.

**(6) Whether the suspect voluntarily submitted to questioning**

With respect to whether Mr. Davis voluntarily submitted to questioning, it is abundantly clear that his participation in the interview was voluntarily, from the first encounter until the interview was over.  Detective Settle informed Mr. Davis several times that he was not under arrest and that he was free to leave.  The defense argues that Mr. Davis initially agreed to talk with the Detectives, because, based upon Mr. Davis's prior experience with Detective Settle, Mr.

11

Davis viewed him as non-threatening.  Thus, the defense argues that such circumstance negates

any apparent voluntariness.  However, such argument is based upon a subjective assessment of

Mr. Davis's beliefs, whereas the Court must only consider objective circumstances.  The

objective analysis leads to the logical conclusion that, considering all circumstances, Mr. Davis

voluntarily submitted to questioning.

### (7)  Whether the questioner believed the interviewee was guilty and manifested said belief objectively creating an atmosphere of significant restraint

The Third Circuit has explained that this factor is "*framed* in a subjective fashion," but

consideration of only objective circumstances is still required.  *Ludwikowski*, 944 F.3d at 132

(emphasis added).  The Third Circuit explained that "when officers have 'more cause for

believing the suspect committed the crime,' there is a 'greater tendency to bear down in

interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*.'"

*Id.* at 133 (quoting *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (quoting *Steigler*,

496 F.2d at 799)).  The Supreme Court also expressly directs courts to consider objective

circumstances, if any, related to an officer's belief about guilt or innocence.  In *Stansbury,* the

Supreme Court explained that an "officer's knowledge or beliefs may bear upon the custody

issue *if they are conveyed, by word or deed*, to the individual being questioned."  *Id.* at 325

(emphasis added).

Here, Detective Settle subjectively believed that Mr. Davis was culpable, based upon the

evidence he had acquired during his investigation.  The related objective circumstances show

that, while interviewing Mr. Davis, Detective Settle presented him with the incriminating

Facebook chats and told him that he knew that Mr. Davis sold B.G. the fatal dose.  Thus, "by

word and deed" Detective Settle "manifested" to Mr. Davis his subjective belief that Mr. Davis

was culpable.  *Id.*  However, minimal information was presented to Mr. Davis, consisting of

messages in which Mr. Davis was a participant.  The simple, non-repetitive, statement that

Detective Settle believed Mr. Davis sold the fatal dose, occurring towards the end of the

interview, would not "have affected how a reasonable person in that position would perceive his

or her freedom to leave."  *Id.*  At most, Detective Settle's expression of his belief, that Mr. Davis

was guilty, might cause a reasonable person to believe that an arrest may be imminent.

However, even after Detective Settle had confronted Mr. Davis with Detective Settle's

information and beliefs, at the end of the interview, Mr. Davis was permitted to leave.

Moreover, during the entirety of the circumstances, from first encounter through Mr. Davis's

exit, there is no suggestion of an in-custody interview that would require *Miranda* warnings.

Detective Settle's accusation that he believed Mr. Davis was guilty, and the presentation of

evidence towards the end of the interview, does not change that conclusion.

### (8)  Whether the interviewee was released when the questioning was over

Mr. Davis was released when questioning was over.  Even though Detective Settle felt he

had sufficient evidence to arrest Mr. Davis right then, he did not arrest him.  From first contact

with Mr. Davis, Detective Settle told Mr. Davis that he was not under arrest and that he was free

to leave.  Tr. 38.  Such circumstances did not change at all through the end of Mr. Davis's

encounter with the Detectives.  The fact, that Mr. Davis was free to leave through the interview

and that he was permitted to leave as soon as questioning was over, leans in favor of finding that

Mr. Davis was not in custody.

### (9) Whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*

In this case, the Court's review of the totality of the circumstances leads to the conclusion

that Mr. Davis's freedom of movement was not restricted to the degree associated with a formal

arrest. Accordingly, a reasonable person in Mr. Davis's position would have felt free to leave if he had wanted to. Thus, Mr. Davis's interrogation environment did not present "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 134 (citations and quotations omitted). This factor weighs in favor of finding that Mr. Davis was not in custody.

### IV.    Conclusion

Mr. Davis was not in custody at any time during his encounter with the Detectives, nor was his freedom of movement restricted to the degree associated with a formal arrest. He voluntarily agreed to be interviewed. He chose not to leave his work site to conduct the interview; instead, he chose to be interviewed in the rear seat of the Detective's police car. Mr. Davis was told several times that he was not under arrest and that he was free to leave at any time. The Court finds that, under the circumstances present here, a reasonable person would have felt free to end the questioning and leave at any time during the interview. Therefore, the Court finds that Mr. Davis was not in custody and suppression of his statements is not warranted.

Accordingly, Mr. Davis's Motion to Suppress Statement will be denied.


### <u>ORDER</u>

AND NOW, this 4th day of March 2025, for the reasons explained above, it is hereby ORDERED that Laven Davis's Motion to Suppress Statements (ECF No. 35) is DENIED.


Marilyn J. Horan
United States District Judge