UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal Action No. 23-138 (RBW) |
| | ) | |
| LAVEN DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

The defendant, Laven Davis, was charged by indictment with "knowingly, intentionally, and unlawfully distribut[ing] a quantity of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance," which allegedly resulted in the "serious bodily injury and death to [Brianne Grose (also referred herein as "the decedent")]," in violation of 21 U.S.C. § 841(a)(1).  Indictment at 1, ECF No. 1.  Before and during his trial the defendant challenged the government's Federal Rule of Criminal Procedure 16 expert witness disclosure regarding one of the government's expert witnesses, Forensic Pathologist Dr. Eric Vey, see Defendant's Motion To Compel Pursuant to F. R. Crim. P. 16(a)(1)(G) As To Dr. Eric Vey ("Def's. Mot. to Compel") at 1, ECF No. 130, and also attempted to preclude Dr. Vey from testifying as an expert witness, see Defendant's Motion In Limine To Preclude Dr. Eric Vey From Testifying As An Expert Witness Under F.R.E. 702 ("Def's. Mot. in Limine") at 1, ECF No. 134.  For the reasons explained in this memorandum opinion, consistent with the Court's oral rulings, and upon careful consideration of the parties' submissions and oral arguments, [1] the

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision:  (1) the Defendant's Motion To Compel Pursuant To F. R. Crim. P. 16(a)(1)(G), Exhibit A, March 27, 2025, Expert Witness Disclosure Letter Regarding Dr. Vey ("March 2025 Expert Disclosure") at 1, ECF No. 130-1;

(continued . . .)

Court now reaffirms that the government's expert witness disclosure regarding Dr. Vey, along with the supplemental expert disclosures regarding Dr. Vey, sufficiently satisfied the government's disclosure obligations pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G). Additionally, the Court reaffirms its denial of the Defendant's Motion In Limine To Preclude Dr. Eric Vey From Testifying As An Expert Witness Under F.R.E. 702, ECF No. 134.

## I.  BACKGROUND

### A.  Factual Background

By letter dated March 27, 2025, the government notified the defendant that it "intend[ed] to present expert testimony by Dr Eric L. Vey during the" defendant's trial.  March 2025 Expert Disclosure at 1.  The government noted that "Dr. Vey's qualifications to provide" expert testimony were "detailed in the enclosures that accompany[ied the] letter and that [were] incorporated by reference [in the letter itself], including in [Dr. Vey's] curriculum vitae."  Id. The March 2025 Expert Disclosure notified the defendant that "Dr. Vey's testimony w[ould] include an explanation of[:]"

> 1.  "the significance of the quantitative levels of the substances that were detected in Brianne Grose's blood as established by the [ ] toxicology report[;]"

---

(. . . continued)
(2) the Defendant's Motion To Compel Pursuant To F. R. Crim. P. 16(a)(1)(G), Exhibit B, August 7, 2025, Expert Witness Supplemental Disclosure Letter Regarding Dr. Vey ("Aug. 2025 Supplemental Disclosure Letter") at 1, ECF No. 130-2; (3) the Defendant's Motion To Compel Pursuant To F. R. Crim. P. 16(a)(1)(G), Exhibit C, Letter From Dr. Vey To The Government ("Letter from Dr. Vey") at 1, ECF No. 130-3; (4) the United States Response To Additional Defense Motions ("Gov't's. Response"), at 1, ECF No. 145; (5) the arguments made by the government and the defendant during the pre-trial hearing on September 12, 2025; (6) the government's full expert disclosure regarding Dr. Vey that was supplied to the Court by the government in the pre-trial hearing on September 12, 2025; (7) the government's Supplemental Expert Disclosure ("Sept. 2025 Suppl. Disclosure"), at 1, ECF No. 156; (8) the defendant's Response To The Government's Supplemental Filing At ECF No. 156 And Request For Hearing ("Def's. Reply"), at 1, ECF No. 157; (9) the government's Second Supplemental Expert Disclosure ("Oct. 2025 Suppl. Disclosure"), at 1, ECF No. 160; and (10) the arguments made by counsel at the beginning of the trial on October 6, 2025, and October 7, 2025.

2.    "the significance of the physical observations of Ms. Grose's body at the death scene as well as thereafter by the Mercer County Coroner[;]"

3.    "the significance of the absence of observations that would indicate a non-toxicological cause of death[;]"

4.    "the significance of the presence of observations that indicate a toxicological/overdose cause of death, including fluid exuding into/from Ms. Grose's mouth area that is strong evidence of pulmonary edema triggered by an overdose[;]"

5.    "why an autopsy was not necessary in this particular case for a reliable conclusion to be reached regarding cause of death[;]"

6.    "the concept of post-mortem re-distribution relative to the toxicology results and the cause of death conclusion in this case[;]"

7.    "the toxicological significance of blood versus urine regarding what, and when, substances were consumed and metabolized[;]" and,

8.    "why a urine sample was not necessary in this particular case for a reliable conclusion to be reached regarding cause of death."

Id.  Attached to the March 2025 Expert Disclosure was Dr. Vey's Curriculum Vitae, which listed his:  (1) "positions prior to retirement," (2) "education and training," (3) certificates and licenses, (4) the professional and scientific societies of which he is a member, (5) his teaching experience, (6) his professional publications, and (7) the professional presentations he has presented.  See Curriculum Vitae of Dr. Eric Vey.[2]  A document listing "[c]ourt [c]ases . . . or deposition

---

[2] The government submitted this document to the Court during the pre-trial hearing conducted on September 12, 2025.  So that this document and the documents referenced in footnotes 3, 5, and 7–9 are available to the public, the Court will order the parties to show cause, in writing, why this entire document should not be entered on the public

(continued . . .)

testimony" in which Dr. Vey was an expert witness during the last four years was also attached to the government's March 2025 Expert Disclosure.  See Court Cases Involving Expert Witness Court or Deposition Testimony of Eric L. Vey, M.D., Last Four (4) Years[ ] (All Available Information is Included) May 2020 through Mid-May, 2024.[3]  Also attached to the government's March 2025 Expert Disclosure was a toxicology report for the decedent ordered by John Libonati, dated December 13, 2022,[4] an Elite EMS report for Brianne Grose dated November 29, 2022,[5] two pictures of the decedent's body taken by first-responders after she was found unresponsive, Libonati's Coroner's Report,[6] two pictures of the decedent taken at the Coroner's office, Brianne Grose's Certificate of Death,[7] Brianne Grose's historical medical reports,[8] and the government's Solicitation/Contract/Order For Commercial Products And Commercial Services for Dr. Vey's expert witness services.[9]

On August 7, 2025, the government provided a Supplemental Disclosure Letter to the defendant which expanded on several statements included in the March 2025 Expert Disclosure. See generally Aug. 2025 Supplemental Disclosure Letter.  First, the August 2025 Supplemental Disclosure Letter elaborated on the reason that "[a]n autopsy was [ ] not necessary for blood to

---

(. . . continued)

electronic docket in this case or should be entered on the public electronic docket with appropriate redactions, omitting personally identifying information or other sensitive information that is not otherwise already available to the public.

[3] See footnote 2.

[4] A copy of the toxicology report was submitted as Exhibit B with the Defendant's Motion To Compel Pursuant To F. R. Crim. P. 16(a)(1)(G) As To Jared McAtee, ECF No. 132-2.

[5] See footnote 2.

[6] This document was submitted as Exhibit F with the Defendant's Motion in Limine, ECF No. 134-6.

[7] See footnote 2.

[8] See footnote 2.

[9] See footnote 2.

be reliably drawn from Ms. Grose's heart." Aug. 2025 Supplemental Disclosure Letter at 1. The Supplemental Disclosure Letter stated that Dr. Vey's proposed testimony would explain that a person "who is sufficiently experienced and equipped can externally draw blood from a decedent's heart and can distinguish the appearance of blood from the appearance of other nearby bodily fluids, such as gastric fluid or pericardial fluid." Id. Additionally, the Supplemental Disclosure Letter expanded on Dr. Vey's proposed testimony regarding "the concept of post-mortem re-distribution relative to the toxicology results and the cause of death[,]" by explaining that "[i]f post-mortem re-distribution occurred, it would not have had a significant effect on the level of fentanyl in the drawn blood because of the limited duration between the time of death and the time of the blood draw." Id. The Supplemental Disclosure Letter also stated that "[t]he fentanyl level at death would still have been well above the level of lethality even if post-mortem re-distribution occurred." Id. Further, the letter indicated that Dr. Vey's proposed testimony would explain that "[u]rine is more historical than blood" and therefore a "urine sample was not necessary in this particular case." Id. at 1–2.

Attached to the August 2025 Supplemental Disclosure Letter was a letter from Dr. Vey in which he responded to three questions presumably posed by the government. See generally Letter From Dr. Vey. Dr. Vey's letter explained that the "95 ng per mL" "blood level (concentration) of fentanyl in this case . . . is fatal." Id. at 1. Dr. Vey wrote that "[t]he lower threshold for lethal postmortem blood levels of fentanyl begins at 3 ng per mL[ and] the average postmortem fatal blood level [is] 8 ng per mL." Id. According to Dr. Vey, the decedent's "blood level [was] nearly 32 times higher than the lower lethal threshold, and nearly 12 times higher than the average postmortem lethal fentanyl level of 8 ng per mL." Id. It was Dr. Vey's opinion that "the fentanyl alone, in the absence of any and all other drugs found on the analysis, [wa]s

more than sufficient to be the primary cause of death" and "in the absence of fentanyl, death would not have occurred." Id. Lastly, Dr. Vey wrote that "[i]t [was] not possible to provide any temporal analysis as to when any of the drugs were ingested relative to the death[,]" but that "it [was] likely, given the extraordinarily high blood level of fentanyl found in this case, that the intake of fentanyl occurred in close temporal proximity to the decedent's demise." Id.

On September 25, 2025, the government filed an additional Supplemental Expert Disclosure. See generally Sept. 2025 Suppl. Disclosure. In this submission, the government represented that Dr. Vey's proposed testimony "regarding the significance of the fentanyl level and the significance vel non of postmortem redistribution, is supported by [eight listed][10] publications/studies[.]" Id. at 1. Additionally, the government represented that Dr. Vey's proposed testimony would also be "supported by [his] extensive real-world experience, training, and education." Id. at 2.

On October 2, 2025, the government filed its Second Supplemental Expert Disclosure "to supplement its prior disclosures related to the expert testimony of Forensic Pathologist Dr. Eric Vey." Oct. 2025 Suppl. Disclosure at 1. The government highlighted that Dr. Vey formerly served as "the sole forensic pathologist" in eleven "counties in Pennsylvania . . . for more than two decades." Id. The disclosure represented that during that time, Dr. Vey "personally worked on, approximately 200 [death cases that] involved autopsies following overdoses post-fentanyl

---

[10] The eight listed "publications/studies" in the government's September 2025 Supplemental Disclosure were: (1) "Disposition of Toxic Drugs and Chemicals in Man, Baselt (12th ed., Published 2020)[;]" (2) "Therapeutic and Toxic Blood Concentrations of Nearly 1,000 Drugs and Other Xenobiotics, Schulz, et al. (Published 2012 in Crit Care)[;]" (3) "A Review of Toxicological Profile of Fentanyl—A 2024 Update, Williamson and Kermanizadeh (Published 2024 in Toxics)[;]" (4) "Postmortem Fentanyl Concentrations: A Review, McIntyre and Anderson (Published 2 2012 in Journal of Forensic Research)[;]" (5) "Postmortem Toxicology Findings from the Camden Opioid Research Initiative, Kusic, et al. (Published 2023 in PLoS One)[;]" (6) "Surge in Fentanyl Toxicity Deaths in Jefferson Parish, LA, 2013-2018, Noto, et al. (Published 2019 in Ochsner Journal)[;]" (7) Validation and Cross-Reactivity Data for Fentanyl Analogs With the Immunalysis Fentanyl ELISA, Guerrieri, et al. (Published 2019 in Journal of Analytical Toxicology)[;] (8) "Postmortem Analysis of Opioids and Metabolites in Skeletal Tissue, Vandenbosch, et al. (Published 2022 in Journal of Analytical Toxicology)." Sept. 2025 Suppl. Disclosure at 1–2.

consumption[, and] . . . 400 non-autopsy cases that involved overdoses post-fentanyl consumption." Id. Thus, according to the government, "Dr. Vey's [proposed] testimony in this case [would] be based, largely but not exclusively, on the thousands of death and non-death cases that he worked on as a forensic pathologist, including the approximately 600 that involved overdoses following fentanyl consumption." Id. The government represented that "[t]he 95 ng/ml fentanyl level at issue in this case is one of the highest fentanyl levels, if not the highest fentanyl level, in any case that Dr. Vey has personally worked on." Id. at 2. Moreover, the government asserted that "Dr. Vey's testimony [would] also be based on the experience of forensic practitioners with whom he consulted over the years and/or who have had the products of their experience and research published, including in the [eight] publications and studies cited in the [government]'s prior" September 2025 Supplemental Expert Disclosure. Id. at 1–2. For example, the "Disposition of Toxic Drugs and Chemicals in Man, Baselt (12th ed., Published 2020)" treatise "aggregates the findings from . . . well over 100 [fentanyl] overdose deaths" and "reports the average fatal fentanyl blood level as 8.3 ng/ml with the bottom of the lethal range (i.e., sufficient to cause death) starting at 3 ng/ml, with both levels being well below the 95 ng/ml level at issue in this case[,]" according to the government. Id. at 2.[11] Additionally, the publication "A Review of Toxicological Profile of Fentanyl—A 2024 Update, Williamson and Kermanizadeh (Published 2024 in Toxics)" cited in the government's September 2025 Supplemental Expert Disclosure, cites a study that, according to the government, analyzed "150 overdose deaths involving fentanyl . . . between 2013 and 2018" and reported that "[t]he average

---

[11] The publication "Therapeutic and Toxic Blood Concentrations of Nearly 1,000 Drugs and Other Xenobiotics, Schulz, et al. (Published 2012 in Crit Care)" cited in the government's September 2025 Supplemental Expert Disclosure also "similarly reports the bottom of the lethal fentanyl blood level range as 3 ng/ml" based on "several studies conducted over the last 20+ years" according to the government's October 2025 Supplemental Disclosure. Id. at 2.

7

fentanyl blood level in the decedents was . . . 17.62 ng/ml." Id. Also, another study in the publication reported that "[t]he average fentanyl blood level" detected in "40 overdose deaths involving fentanyl [over] the last decade" was "16 ng/ml[.]" Id. Moreover, the government's October 2025 Supplemental Disclosure stated that:

> [i]n reaching his cause of death opinion in this case, Dr. Vey (1) considered the injury suffered – i.e., serious bodily injury and death; (2) ruled in the cause of the serious bodily injury and death -– i.e., the 95 ng/ml fentanyl level that is well above his experientially known, and publicationally supported, lethal level; and (3) ruled out any other potential cause of death.

Id. at 3. The government further asserted that Dr. Vey would explain at trial that there is no credible evidence that Ms. Grose (1) "was subjected to any violence or other trauma at any time contemporaneous with her death[; (2)] experienced any health problems, such as cardiac or cerebral conditions, contemporaneous with her death[; (3) or] suffered from any illness or infection contemporaneous with her death." Id.

## B.    Procedural Background

On September 5, 2025, the defendant filed his motion to compel in regards to the government's expert witness disclosure regarding Dr. Vey. See generally Def's. Mot. to Compel. The same day, the defendant filed his motion in limine to preclude Dr. Vey from testifying as an expert witness. See generally Def's. Mot. in Limine. On September 9, 2025, the Court ordered the defendant to advise "the Court in writing whether the government incorrectly represented that it provided Dr. [ ] Vey's qualifications as an expert witness to defense counsel, including his curriculum vitae, a list of his prior publications, and a list of trials and depositions in which Dr. Vey has testified as described in" the government's expert disclosure letters. Order (Sept. 9, 2025) at 1, ECF No. 139. The Court explained that it would withhold a decision on

"whether to grant the defendant's motion to compel [regarding] Dr. Vey pending" the defendant's response.  Id.  The Court also ordered that:

> if the government intend[ed] to present testimony to the jury [at trial] from Dr. Vey regarding the decedent's cause of death other than testimony regarding the alleged amount of fentanyl that was allegedly detected in the decedent's body after her death, as compared to the amount of fentanyl which has allegedly caused other individuals to experience fentanyl overdoses that resulted in deaths, then the government must provide that information to the defendant forthwith.

Id. at 1–2.  The Court ordered the parties to comply with its September 9, 2025 Order by September 11, 2025.  Id. at 2.

On September 11, 2025, the government filed its response to the defendant's motions. See generally Gov't's. Response.  The following day, September 12, 2025, the parties appeared before the Court for a pre-trial hearing.  See Minute Entry (Sept. 16, 2025), ECF No. 148. During the pre-trial hearing, the government provided the Court with a copy of its full expert witness disclosure regarding Dr. Vey that the government previously provided to the defendant. See supra Part I(A).  The Court explained that it would withhold a decision regarding the defendant's motion to compel regarding Dr. Vey until it "conclude[ed] its review of Dr. Vey's expert disclosure report . . . and the supplement the government represented it would provide to the defendant and the Court."  See Order (Sept. 16, 2025) at 1 ("Sept. 16, 2025, Order"), ECF No. 149.  The Court explained that if it:

> conclude[d] that the expert disclosure concerning Dr. Vey provide[d] adequate information regarding, at least: (1) the number of individuals who were determined to have died as a result of a fentanyl overdose that Dr. Vey considered in reaching his opinion as to the decedent's cause of death; and (2) why the amount of fentanyl found in the decedent's body, as compared to those other individuals, informed his opinion in this case, then the Court w[ould] deny the motion.

Id. at 1–2.  Similarly, the Court explained that it would also withhold its decision on whether to grant the defendant's motion in limine regarding Dr. Vey until it "conclude[d] its review of Dr.

Vey's expert disclosure report that was provided by the government [during] the pre-trial hearing . . . and the supplement the government indicated it w[ould] provide to the defendant and the Court." Id. at 2.

On September 25, 2025, the government filed its September 2025 Supplemental Disclosure, and the defendant filed his Response To The Government's Supplemental Filing At ECF No. 156 and Request For Hearing, ECF No. 157. Based on the parties' additional filings, the Court issued a Memorandum Opinion Order on September 30, 2025, granting the defendant's motion to compel regarding Dr. Vey's expert disclosure because the government failed to provide even the minimal information the Court indicated the government would need to provide the defendant in order to comply with its obligations pursuant to Federal Rule of Criminal Procedure 16, i.e. the bases for Dr. Vey's opinions in this case. See Memorandum Opinion Order (Sept. 30, 2025) at 3, 6 ("Sept. 30, 2025, Order"), ECF No. 159; Sept. 16, 2025, Order at 1–2. Because the government failed to provide this information in its expert disclosure or supplemental expert disclosure, the Court granted the defendant's motion to compel and ordered the government to comply with its Order by providing the bases for Dr. Vey's opinions by October 3, 2025, because the start of trial in this case was imminent. Sept. 30, 2025, Order at 6.

Additionally, in the Court's September 30, 2025 Order, the Court granted without prejudice the defendant's motion in limine to preclude Dr. Vey from testifying as an expert witness. Id. at 12–13. The Court explained that because the government did not provide, up to that point, "the principles or methodology that Dr. Vey utilized in forming his proposed opinions[,]" the Court could not "assess the reliability of Dr. Vey's proposed opinions" or "scientific expert testimony[.]" Id. at 11–12. The Court explained that "[i]f the government [ ] made a sufficient showing of the principles and methods that Dr. Vey used, and how those

10

principles and methods were applied in this case, then the Court w[ould] reconsider whether Dr. Vey may testify as an expert." Id. at 12.

Subsequently, on October 2, 2025, the government filed its Second Supplemental Expert Disclosure. See generally Oct. 2025 Suppl. Disclosure. Based on the filing of the government's Second Supplemental Expert Disclosure, the Court issued an Order stating that it would "reconsider whether Dr. Vey may testify as an expert as a preliminary matter at trial." Minute Order (Oct. 5, 2025), ECF No. 163.

Trial in this case commenced on October 6, 2025. See Minute Entry (Oct. 6, 2025), ECF No. 168. Before conducting the voir dire, the Court inquired whether the defendant had any additional arguments in support of his motion in limine after receiving the government's second supplemental disclosure. See Oct. 6, 2025, Trial Tr. 2:15–17. Before addressing his arguments regarding the motion in limine as to Dr. Vey, the defendant again raised his arguments challenging the government's expert disclosure regarding Dr. Vey pursuant to Federal Rule of Criminal Procedure 16. See id. at 2:20–5:13. Specifically, the defendant contended that the government's expert disclosure and supplemental expert disclosures regarding Dr. Vey still did "not explain the basis and reasoning for [Dr. Vey's] opinions" because they did not: (1) "explain how" the "overdoses that Dr. Vey has dealt with . . . compare to one another . . . [and] apply in this case[;]" (2) "rule out or even attempt to rule out alternative causes of death[;]" (3) "explain how the publications support a cause of death of fentanyl intoxication in this case[;]" (4) and "explain what the terminal number is whereupon a person could not have died of other causes." Id. at 3:08–5:13. And, as to the defendant's motion in limine to preclude Dr. Vey from testifying as an expert witness, the defendant argued that the Court should conduct a Daubert hearing so that the defendant could "challenge Dr. Vey's experience, his bases and his reasons" and show

11

that Dr. Vey's testimony would not "be helpful to the trier of fact by a preponderance of the evidence." Id. at 7:3–9.

Regarding the defendant's challenge to the government's expert disclosure as to Dr. Vey, the Court held that with the additional expert disclosures as to Dr. Vey, "the government [ ] satisfied its Rule 16 obligation" and the defendant's challenges seemed to be challenging "the [ ] weight" of the evidence "as compared to [the] admissibility" of the evidence. Id. at 8:4–14. Additionally, during the resolution of preliminary matters on the second day of trial, and after the jury had been selected, the Court held that "pursuant to the several [expert disclosure] submissions made" by the government regarding Dr. Vey, the government had provided adequate information that "clearly support[ed Dr. Vey] being able to provide expert opinion that can be reliably relied upon by the jury in making an assessment as to what the cause of death was." Id. at 3:1–17.

At the conclusion of the trial, the defendant was found guilty of the conduct for which he was indicted. See Minute Entry (Oct. 15, 2024), ECF No. 174.

## II.    ANALYSIS

### A.    Motion to Compel Expert Witness Disclosure Regarding Dr. Vey

Federal Rule of Criminal Procedure 16 "is intended to prescribe the minimum amount of discovery to which the parties are entitled." United States v. Smith, No. 24-cr-106 (KM), 2025 WL 3635051, *1 (M.D. Pa. Dec. 15, 2025) (citing Fed. R. Crim. P. 16 advisory committee's note to 1974 amendment). As previously explained, the "purpose of Rule 16(a)(1)(G) is to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." United States v. Mitchell, No. 09-cr-105 (DSC), 2013 WL

12202563, at * 1 (W.D. Pa. Oct. 7, 2013) (citing Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment); see Sept. 30, 2025, Order at 3.  Rule 16(a) applies only to information "material to preparing the defense."  E.g., United States v. Smith, No. 2-cr-172 (MRP), 2025 WL 3284462, *4 (E.D. Pa. Nov. 25, 2025).  "The Third Circuit has [ ] emphasized that mere speculation that useful information may exist is insufficient to" find that the government has not complied with its disclosure requirements.  Id. (citing United States v. Ramos, 27 F.3d 65, 68–69 (3d Cir. 1994)). In this case, the defendant contends that he repeatedly asked the government for an expert witness disclosure report as to Dr. Vey that "provide[d] a sufficient basis and reasoning for [Dr. Vey's] opinion[s] so that [the defendant] c[ould] challenge the admissibility" of Dr. Vey's testimony.  Oct. 6, 2025, Trial Tr. at 6:15–17.  Because the government eventually provided the defendant with sufficient information pursuant to its obligations under Rule 16, the Court declined to grant the defendant's renewed motion to compel regarding Dr. Vey for the following reasons.

In the September 30, 2025 Order, the Court granted the defendant's motion to compel as to Dr. Vey because the government failed to "include the bases for Dr. Vey's proposed expert opinions" as required by Federal Rule of Criminal Procedure 16 in either the full expert witness disclosure or the September 2025 Supplemental Disclosure.  See Sept. 30, 2025, Order at 6, 12. The Court found that the government had provided "a complete statement of all opinions that the government" sought to "elicit from" Dr. Vey as required by Federal Rule of Criminal Procedure 16(a)(1)(G)(iii), but did not disclose "the bases . . . for [those] opinions" as required by subparagraph (G)(iii).  Id. at 4.  Specifically, the Court explained that although Dr. Vey's opinion was that "[t]he lower threshold for lethal postmortem blood levels of fentanyl begins at 3 ng per mL, [and] the average postmortem fatal blood level [is] 8 ng per mL[,]" see Letter from Dr. Vey

13

at 1, Dr. Vey did not, at a minimum, provide the "sample size of individuals" that his conclusions were based on or cite to "a publication or study that he relied on to conclude that the decedent's blood level (concentration) of fentanyl was at a lethal level."  Sept. 30, 2025, Order at 4–5.  Without at least providing that information, the Court found that Dr. Vey's expert disclosure only summarily concluded that the decedent had blood concentration fentanyl levels that were "nearly 32 times higher than the lower lethal threshold, and nearly 12 times higher than the average postmortem lethal fentanyl level of 8 ng per mL."  Id. at 5.

As required by the Court's September 30, 2025 Order, the government then filed its Second Supplemental Expert Disclosure which provided that over the span of "more than two decades[,]" Dr. Vey "personally worked on thousands of death cases and . . . a similar number of non-death cases . . . [where he] interpret[ed] toxicology results[.]"  Oct. 2025 Suppl. Disclosure at 1.  Of those cases, "approximately 200 involved autopsies following overdoses post-fentanyl consumption" and "400 [involved] non-autopsy . . . overdoses post-fentanyl consumption."  Id.  Additionally, the government explained that Dr. Vey's proposed testimony would "also be based on the experience of forensic practitioners with whom he consulted over the years and/or who have had the products of their experience and research published, including in the publications and studies cited in the" government's September 2025 Supplemental Expert Disclosure.  Id. at 1–2.  The government then went on to detail that the "lower threshold" and "average postmortem fatal blood level[s]" Dr. Vey based his opinions on were derived from fatal fentanyl blood levels included in those publications and studies.  See id.; Letter from Dr. Vey at 1.  Moreover, the government explained that the "95 ng/ml fentanyl level at issue in this case is one of the highest fentanyl levels, if not the highest fentanyl level, in any case that Dr. Vey has personally worked on."  Id.  The government also represented that Dr. Vey utilized a "differential diagnosis

methodology" to form his "cause of death opinion in this case" by ruling out other causes that would have caused the decedent's serious bodily injury and death. Id. at 3.

After receiving this additional information in the government's Second Supplemental Expert Disclosure, the defendant continued to argue that he lacked the "basis and reasoning for [Dr. Vey's] opinions[,]" see Oct. 6, 2025, Trial Tr. at 3:09–5:13, while at the same time lodging detailed reasons why Dr. Vey's bases and reasons for his cause of death opinions were purportedly faulty. For example, during the trial the defendant argued that Dr. Vey's reference to a treatise that reported "the average fatal fentanyl blood level as 8.3 nanograms per milliliter with the bottom level of the lethal range . . . at 3 nanograms per milliliter . . . [was] misleading" because "the word 'minimally'" was not used. Id. at 3:21–4:5. This is so, according to the defendant, because the treatise provides "an average range, wherein . . . 3.0 nanograms per milliliter of fentanyl in blood" was at the low end of the range and "28 nanograms per milliliter of fentanyl in blood" was at the higher end of the range. Id. at 4:3–16. Even more significantly from the defendant's perspective, this range was taken from older "cases involving fentanyl patches." Id. at 4:17–5:13. In the defendant's view, the government was "hiding the ball." Id. at 4:16. However, the Court did not agree and the Court still maintains that position.

The example just discussed shows that the defendant had the information he needed to prepare his defense and lodge credible attacks on the government's expert witness based on a more fulsome analysis of the treatise that Dr. Vey relied on in support of his opinions in this case. One of the purposes of Rule 16 is to minimize surprise at trial, see Fed. R. Crim P 16 advisory committee's note to 1993 amendment, and the defendant can hardly credibly say that he was surprised by any of the opinions or bases for them offered by Dr. Vey. The defendant was only due "a summary of the bases relied upon by" Dr. Vey, see Fed. R. Crim. P. 16, Advisory

15

Committee Notes, 1993 Amendment, and that is precisely what the government provided.  The

defendant's attack is not one to be resolved pursuant to a Rule 16 motion, but one that is left for

the jury to decide.  See Fed. R. Crim. P. 16, Advisory Committee Notes, 1993 Amendment

(explaining that expert disclosure reports pursuant to Rule 16 "are not intended to create

unreasonable procedural hurdles").

For these reasons, the Court denied the defendant's renewed motion to compel in regards

to the government's expert disclosure regarding Dr. Vey.  And, there is no reason for the Court

to change its position now.

**B.    Motion in Limine to Preclude Dr. Vey From Testifying as an Expert**

In the defendant's motion in limine, he argued that Dr. Vey's (1) "proposed testimony

[wa]s not supported by sufficient facts and data," and (2) "[wa]s not the product of reliable

principles and methods, and [ ] thus [could not] be a reliable application of the principles and

methods of forensic pathology."  Def's. Mot. in Limine at 3.  For the reasons below, the Court

disagreed.

As previously explained, Federal Rule of Evidence 702 provides that:

[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion . . . if the proponent demonstrates to the court that it is more likely than not that:

> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[12];
> (b)  the testimony is based on sufficient facts or data;

---

[12] There is hardly a question as to whether Dr. Vey's purported testimony was helpful to the jury in this case.  As a forensic pathologist, Dr. Vey was expected to testify regarding the decedent's cause of death—specifically whether the alleged 95 ng per mL blood level of fentanyl allegedly found in the decedent's body postmortem would was fatal.  See Letter From Dr. Vey.  This was a fact that was obviously central to the government's case because without persuading the jury that the decedent did in fact have a fatal level of fentanyl in her blood postmortem, it would have been exceedingly difficult—if not impossible—for the government to prove that the defendant did in fact distribute a quantity of fentanyl to the decedent that caused her death.  See Indictment at 1.

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

See Sept. 30, 2025, Order at 8.  Additionally, there must be a showing by the proponent by a preponderance of the evidence that the expert's testimony will be "reliable and helpful." See Fed. R. Evid. 702 advisory committee's notes to 2000 amendment; Bourjaily v. United States, 483 U.S. 171, 175–76 (1987) ("admissibility determinations [must] be established by a preponderance of proof").

Regarding the defendant's first contention, the Court previously explained that Dr. Vey would be permitted to "rely on the facts and data provided in the toxicology report and the coroner's report[,]" because "it is well-settled that one expert may rely upon another expert's opinion in formulating his own." Sept. 30, 2025, Order at 10 (citing Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., 286 F.R.D. 266, 271 (W.D. Pa. 2012)).  The Court explained that if at trial, "the existence of this evidence [was] in fact properly established[,]" then Dr. Vey would not be precluded "from relying on these reports." Id.  Additionally, the defendant argued that Dr. Vey could not have "reliably determine[d] the cause of the decedent's death" in this case without performing an autopsy, see e.g., Def's. Mot. in Limine at 8–9, and discounted the facts and data included in the other reports and data accompanying Dr. Vey's full expert witness disclosure, i.e. the toxicologist report, coroner's report, Elite EMS report for Brianne Grose dated November 29, 2022, two photographs of the decedent's body taken by first-responders after she was found unresponsive, two photographs taken of the decedent at the Coroner's office, and Brianne Grose's historical medical reports.  And, simply because the defendant believes that Dr. Vey should have performed an autopsy, does not mean that Dr. Vey's testimony was not based on

17

other facts and data sufficient to support his expert opinions.[13]  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 594–96 (1993) (explaining that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate"); accord United States v. Mitchell, 365 F.3d 215, 244 (3d Cir. 2004) ("Daubert does not require that a party who proffers expert testimony . . . prov[e] to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon good grounds . . . it should be tested by the adversary process") (internal quotation omitted); Cf. United States v. Hixon, 838 Fed. Appx. 961, 964 (6th Cir. Dec. 30, 2020) (finding evidence sufficient to support cause of death finding that decedent died of fentanyl overdose despite the lack of an autopsy because the deputy coroner made clear that the level of fentanyl found in decedent's body was lethal). Therefore, the Court disagreed with the defendant's first contention that Dr. Vey's proposed testimony was not based on sufficient facts or data.

As to the defendant's second argument, the Court explained that although it was initially ruling against the government, it would "reconsider whether Dr. Vey may testify as an expert" witness at trial "[i]f the government [ ] made a sufficient showing of the principles and methods that Dr. Vey used, and how those principles and methods were applied in this case." Sept. 30, 2025, Order at 12; see Fed. R. Evid. 702(c).  As discussed, supra Parts I(B) and II(A), after the Court issued its September 30, 2025 Order, the government filed an additional supplemental

---

[13] The conclusion that an autopsy was unnecessary was supported by Dr. Vey's testimony which explained that if "a person [ ] decides they're going to commit suicide by stepping on a railroad track, [and] they get hit by a train[,] . . . you really don't need an autopsy right there, because you already kind of figured that one out." Oct. 8, 2025, Trial Tr. 126:10–12.  By analogy, Dr. Vet testified that in this situation, "the deputy coroner [ ] would draw fluids for toxicology, and then [Dr. Vey] would assist in interpreting the toxicology findings." Id. at 126:15–17. And that, in the "close to 700" fentanyl overdose death cases Dr. Vey testified he worked on, he would not always perform an autopsy and would instead base his findings on toxicology consultation alone. Id. at 126:23–127:3. However, Dr. Vey explained that "in cases where the cause of death is not clear, the best way to determine [cause of death], by exclusion of other possibilities, is an . . . internal examination," i.e. an autopsy. Id. at 169:7–10.  Here, he testified that an autopsy was not required due to other facts and data available to him, for example, the fact that the "95 nanograms per milliliter [of fentanyl found in the decedent's blood], [was] the highest level [Dr. Vey] had ever seen to that point" in his career. Id. at 134:6–9.

expert disclosure regarding Dr. Vey, see Oct. 2025 Suppl. Disclosure.  After considering the government's additional October 2025 Supplemental Disclosure, the Court concluded that a Daubert hearing was unnecessary to assess whether Dr. Vey could testify as an expert or whether his testimony would be reliable and helpful for the jury.

Specifically, the government's October 2025 Supplemental Disclosure provided that not only would Dr. Vey's testimony be based on his experience as "the sole forensic pathologist . . . for [ ] 11 counties" in Pennsylvania for a number of years during which "he personally worked on . . . thousands of death and non-death cases[,] . . . including [ ] approximately 600 that involved overdoses following fentanyl consumption[,]" but also the experiences of other "forensic practitioners with whom he consulted over the years and" various "publications and studies."  Oct. 2025 Suppl. Disclosure at 1–2; see Taylor v. Shields, 744 Fed. Appx. 83, 87–88 (3d Cir. July 31, 2018) (affirming the district court's holding permitting a forensic anatomic pathologist to testify as an expert because the forensic pathologist had "decades of experience" and "testified as an expert witness hundreds of times on the very topic").  As indicated, Dr. Vey's opinion that the "95 ng per mL[ ] is fatal" and that "in the absence of fentanyl, death would not have occurred[,]" Letter from Dr. Vey at 1, was based, in part, on several scientific publications.  One of the treatises Dr. Vey relied on "report[ed] the average fatal fentanyl blood level as 8.3 ng/ml with the bottom of the lethal range . . . starting at 3 ng/ml[,]" which was "well below the 95 ng/ml level at issue in this case."  Oct. 2025 Suppl. Disclosure at 2.  Similarly, another publication Dr. Vey relied on reported the "bottom of the lethal fentanyl blood level range as 3 ng/ml"."  Id.  Another reported "[t]he average fentanyl blood level in" "over 150 overdose deaths . . . as 17.62 ng/ml."  Id.  And, another reported the average fentanyl blood level in "over 40 overdose deaths . . . a[t] 16 ng/ml."  Id.  These scientific

19

publications directly supported Dr. Vey's opinions in this case regarding whether the alleged 95 ng/ml blood concentration level of fentanyl found in the decedent was fatal.  See Ramsey v. Salvation Army, No. 21-557 (PLD), 2024 WL 5456282, *6 (W.D. Pa. Nov. 27, 2024), R. & R. adopted No. 21-557 (DSC), 2025 WL 414293, *2 (W.D. Pa. Feb. 6, 2025) (finding Dr. Vey's testimony sufficiently reliable because his opinions were "not based on mere speculation[,]" but instead were based on "his expertise and experience, [and were] supported by scientific treatises and articles."); Wilkoski v. B&T Express, Inc., No. 18-1359 (RJC), 2022 WL 4341491, *7 (W.D. Pa. 2022 Sept. 19, 2022) (finding that a witness was duly qualified as an expert and presented reliable testimony where the expert based his opinions on published studies discussing a medical issue pertinent to the case).

Because the October 2025 Supplemental Disclosure along with the other expert witness disclosures regarding Dr. Vey's proposed testimony included sufficient information regarding the scientific principles and methods Dr. Vey relied on, his decades of work as a forensic pathologist, his specific work on fentanyl overdose death cases, and his review of the facts and data in this case, the Court found that a Daubert hearing was not necessary and Dr. Vey was a duly qualified expert witness in this case.

### III.    CONCLUSION

For the foregoing reasons, the Court denied the defendant's renewed oral motion to compel regarding the expert witness disclosure as to Dr. Vey and denied the defendant's motion in limine to preclude Dr. Vey from testifying as an expert witness in this case.  These rulings are now reaffirmed by the Court.

**SO ORDERED** this 17th day of March, 2026.[14]

REGGIE B. WALTON
United States District Judge

---

[14] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.